*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 86**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JAMES WAITE and LUIS A. ORTEGA,
*Petitioners,*

*v.*

UTAH LABOR COMMISSION, FARR BETTER PREMIUM ICE CREAM,
SANDY CITY, and WORKERS COMPENSATION FUND,
*Respondents.*

No. 20150384
Filed December 1, 2017

Petition for Review of an Agency Decision

Attorneys:

Phillip B. Shell, Nathan Whittaker, Murray, for petitioners

Jaceson R. Maughan, Salt Lake City, for respondent
Utah Labor Commission

Hans M. Scheffler, Eugene C. Miller, Jr., Michael D. Karras, Sandy,
for respondents Farr Better Premium Ice Cream, Sandy City, and
Workers Compensation Fund

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen.,
Stanford E. Purser, Deputy Solic. Gen., Brent A. Burnett,
Asst. Att'y Gen., Salt Lake City, for amicus State of Utah

Troy L. Booher, Beth E. Kennedy, Salt Lake City, for amicus
Utah State Board of Regents

Colin P. King, Charles H. Thronson, Paul M. Simmons,
Salt Lake City, for amicus Utah Association for Justice

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE DURHAM* and JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed an opinion
concurring in the judgment.

JUSTICE PEARCE filed a concurring opinion.

* Justice Durham sat on this case and voted prior to her retirement
on November 15, 2017.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   Here we address the constitutionality of Utah Code section 34A-2-417(2)(a)(ii), a provision of the Workers' Compensation Act (WCA) that limits the time an injured worker has to prove a claim. The section provides that an employee claiming compensation for a workplace injury must be "able to meet the employee's burden of proving that the employee is due the compensation claimed" within "12 years from the date of the accident." If the employee cannot, the claim is barred. Petitioners are two workers who were injured as a result of a workplace accident and filed claims to receive permanent total disability benefits more than twelve years after the original accident. Both had their claims denied and dismissed as untimely under section 34A-2-417(2)(a)(ii). In petitioning for review of the Utah Labor Commission's orders, they argue that this statute acts as a statute of repose and so is unconstitutional under the Open Courts Clause of the Utah Constitution. We conclude that while section 34A-2-417(2)(a)(ii) is a statute of repose, it is nevertheless constitutional under the Open Courts Clause.

**Background**

¶ 2   This consolidated petition stems from two separate orders of the Utah Labor Commission (Commission) denying benefits to two different workers, James Waite and Luis Ortega (collectively, Petitioners). As we are called upon today to decide only questions of law, the facts underlying the Commission's orders will be discussed only briefly.

¶ 3   Each Petitioner was injured in a workplace accident, each filed a request for compensation within six years of the workplace accident in accordance with Utah Code section 34A-2-417(2)(a)(i), and each had his condition worsen after an initial determination of compensation. As a result, each filed for additional benefits after twelve years from the date of the original accident. Each Petitioner's claim was denied by an administrative law judge (ALJ) on the basis that he had failed to "meet the employee's burden of proving that the employee is due the compensation claimed" within the twelve-year period described in section 34A-2-417(2)(a)(ii). Each Petitioner requested the Commission review the ALJ's decision. Among the arguments each Petitioner asserted as a basis for reversal was the one on appeal here: that section 34A-2-417(2)(a)(ii) operates as a statute of repose and so is unconstitutional under the Open Courts Clause of the Utah Constitution.

¶ 4   The Commission, in reviewing Petitioners' claims, noted in each case that the statute at issue appeared to operate as an invalid statute of repose, but concluded that it had no authority as an agency to decide whether the statute was constitutional. Both Petitioners petitioned the court of appeals for review of the Commission's orders. The court of appeals consolidated the petitions and certified the case to us pursuant to Utah Code section 78A-4-103(3) and rule 43 of the Utah Rules of Appellate Procedure.

## Standard of Review

¶ 5   The Utah Administrative Procedures Act vests our court with "jurisdiction to review all final agency action resulting from formal adjudicative proceedings."[1] The Act empowers us to "grant relief" where "a person seeking judicial review has been substantially prejudiced" because "the agency action, or the statute or rule on which the agency action is based, is unconstitutional on its face or as applied"[2] or because "the agency has erroneously interpreted or applied the law."[3] We first address whether the twelve-year limitations period created by Utah Code section 34A-2-417(2)(a)(ii) should be properly understood as a statute of repose. Because we conclude that the section is a statute of repose, we then address whether it is facially unconstitutional under the Utah Open Courts Clause.[4] The interpretation and constitutionality of a statute are questions of law that we review for correctness.[5]

---

[1] UTAH CODE § 63G-4-403(1).

[2] *Id.* § 63G-4-403(4)(a).

[3] *Id.* § 63G-4-403(4)(d).

[4] We note that the Petitioners raised as a third argument that the section is facially unconstitutional under the Utah Uniform Operation of Laws Clause. This argument was inadequately briefed as the Petitioners provided almost no analysis of how our Uniform Operation of Laws precedent applied to section 34A-2-417(2)(a)(ii). *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) (declaring that an issue is inadequately briefed "when the overall analysis of the issue is so lacking as to shift the burden of the research and argument to the reviewing court"). We therefore do not reach this issue.

[5] *Avis v. Bd. of Review of Indus. Comm'n*, 837 P.2d 584, 586 (Utah Ct. App. 1992).

**Analysis**

¶ 6   There are two issues on appeal. First, whether Utah Code section 34A-2-417(2)(a)(ii) should be read as a statute of limitation or a statute of repose. If it is the former, our analysis ends as Petitioners have not raised any argument that the section would be unconstitutional as a statute of limitation and, indeed, such an argument would likely be unavailing as "[s]tate legislatures possess the discretion to enact statutes of limitations, and these statutes are presumptively constitutional."[6] If, on the other hand, we interpret the section as a statute of repose, we must then consider whether it is unconstitutional under the Open Courts Clause. We address each issue in turn and conclude that although the statute should be read as a statute of repose, it survives under the Open Courts Clause.

I. Section 34A-2-417(2)(a)(ii) is a Statute of Repose

¶ 7   The first issue in this case is whether Utah Code section 34A-2-417(2)(a)(ii) should be interpreted as a statute of limitation or as a statute of repose. This is a difficult question, but one that turns on when a "cause of action" accrues under the WCA, a question we have yet to resolve definitively. We address this issue at length in the companion case of *Petersen v. Labor Commission*.[7]

¶ 8   Section 34A-2-417(2)(a) reads as follows:

> A claim [for disability benefits] is barred, unless the employee: (i) files an application for hearing with the Division of Adjudication no later than six years from the date of the accident; and (ii) by no later than 12 years from the date of the accident, is able to meet the employee's burden of proving that the employee is due the compensation claimed under this chapter.

Thus, this section imposes two requirements on an injured worker who seeks disability benefits: First, the worker must file an application for a hearing within six years of the date of the accident giving rise to the injury for which the worker seeks compensation. Then, the worker must prove that he or she is entitled to compensation within twelve years of the injury.[8]

---

[6] *Id.* at 587.

[7] 2017 UT 87, -- P.3d --.

[8] The court of appeals has upheld the six year filing limit as a constitutional statute of limitation. *See Avis v. Bd. Of Review of Indus.*

(Continued)

¶ 9  The initial filing of the application for a hearing invokes the Commission's continuing jurisdiction to hear and decide an employee's claims for compensation due to workplace injuries.[9] Because the Commission's jurisdiction is continuing, the Commission, "[a]fter notice and hearing . . . may from time to time modify or change a former finding or order" awarding compensation.[10] We have "recognized two appropriate bases for reopening and reevaluating an award: (1) a change in condition or new development or (2) the inadequacy of a previous award."[11] Ultimately, "the Commission may exercise its continuing jurisdiction where a claimant's medical condition deviates from its anticipated course."[12]

¶ 10 Prior to 1999, there was no limit on the Commission's continuing jurisdiction to revisit an award of compensation for permanent total disability. The WCA required only that the employee file within six years—not that he or she prove entitlement to benefits within a set timeframe. In 1998, the court of appeals specifically rejected a claim that the Commission's jurisdiction ended at the end of the six year filing period and held that the Commission's jurisdiction "in these cases is indefinite,"[13] an interpretation we later affirmed.[14] The next year, the legislature amended the WCA to include the requirement that the employee "meet the employee's burden of proving that the employee is due the compensation claimed" within twelve years from the date of the accident.[15] As we stated in *Ortega v. Meadow Valley Construction*, by enacting this amendment, "the six-year limitation for filing an application for hearing was retained, and a twelve-year cap was

---

*Comm'n*, 837 P.2d at 586–88; *Middlestadt v. Indus. Comm'n*, 852 P.2d 1012, 1013–14 (Utah Ct. App. 1993).

[9] UTAH CODE § 34A-2-420(1)(a).

[10] *Id.* § 34A-2-420(1)(b).

[11] *Employers' Reinsurance Fund v. Labor Comm'n*, 2012 UT 76, ¶ 23, 289 P.3d 572.

[12] *Id.*

[13] *Burgess v. Siaperas Sand & Gravel*, 965 P.2d 583, 589 (Utah Ct. App. 1998).

[14] *See Ortega v. Meadow Valley Constr.*, 2000 UT 24, ¶ 10, 996 P.2d 1039.

[15] UTAH CODE § 34A-2-417(2)(a)(ii).

established on the continuing jurisdiction of the Commission to reexamine the claim if the employee's physical condition worsened."[16]

¶ 11 Petitioners challenge this twelve-year timeframe as an unconstitutional statute of repose. The Workers Compensation Fund (WCF) contends that it is a statute of limitation. "Whether a statute that bars or terminates a claim for relief is a statute of limitations or a statute of repose depends on the nature of the statute and the manner in which it operates to cut off the legal right of a person to obtain a remedy for an injury."[17] We described the difference between the two types of statutes in *Berry ex rel. Berry v. Beech Aircraft Corp.*, the seminal case addressing the constitutionality of statutes of repose.[18] There we stated:

> A statute of limitations requires a lawsuit to be filed within a specified period of time after a legal right has been violated or the remedy for the wrong committed is deemed waived. A statute of repose bars all actions after a specified period of time has run from the occurrence of some event other than the occurrence of an injury that gives rise to a cause of action. . . . Therefore, a statute of repose may bar the filing of a lawsuit even though the cause of action did not even arise until after it was barred and even though the injured person was diligent in seeking a judicial remedy.[19]

In short, we distinguish statutes of limitation and statutes of repose by looking to the event that triggers the start of the statutory timeframe: if the trigger is the accrual of a cause of action, it is a

---

[16] 2000 UT 24, ¶ 12. The statute does provide for a limited extension of the Commission's jurisdiction in cases where "the employee is fully cooperating in a commission approved reemployment plan" or "the employee is actively adjudicating issues of compensability before the commission." UTAH CODE § 34A-2-417 (2)(c)(ii)(A)–(B).

[17] *Stoker v. Workers' Comp. Fund*, 889 P.2d 409, 411 (Utah 1994).

[18] 717 P.2d 670 (Utah 1985).

[19] *Id.* at 672.

statute of limitation, but if it is some other event, it is a statute of repose.[20]

¶ 12 This, of course, raises the question of when a cause of action accrues under the WCA. We have never directly addressed this question.[21] In general, "a cause of action accrues upon the happening of the last event necessary to complete the cause of action."[22] Stated another way, "[a] cause of action arises the moment an action may be maintained to enforce a legal right."[23]

¶ 13 The WCF argues that a cause of action under the WCA—the right to claim compensation for a workplace injury—arises at the time of the workplace accident. Under the WCF's view, once the worker has experienced an accident causing an injury, the worker can request compensation. The fact that the compensation award may need to be adjusted later does not change the fact that the worker's claim arose on the date of the accident. As we have stated on multiple occasions, "A claim for compensation under the [WCA] is only one claim, no matter how many hearings are had or how many distinct awards are made. It is a claim by the employee for compensation for the injury he has sustained, notwithstanding the compensation may be determined from time to time resulting in many distinct awards."[24] Therefore, the WCF contends, because the twelve-year limitations period begins on "the date of the accident," which is the same date on which the cause of action accrues, the statute is a statute of limitations, not a statute of repose.

¶ 14 Petitioners respond by pointing out that the Commission defers deciding disability claims until after a claimant's injuries have

---

[20] *See Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Sons, Inc.*, 782 P.2d 188, 189 (Utah 1989) ("A statute of limitations precludes suit a legislatively imposed number of years after the accrual of a cause of action. A statute of repose bars suit a specified number of years after the occurrence of a particular event without regard to the date of the accrual of the cause of action.").

[21] The court of appeals has held in the context of a constitutional challenge to the six-year filing period that "a worker's cause of action accrues when the industrial accident occurs." *Middlestadt*, 852 P.2d at 1013.

[22] *Becton Dickinson & Co. v. Reese*, 668 P.2d 1254, 1257 (Utah 1983).

[23] *Ash v. State*, 572 P.2d 1374, 1379 (Utah 1977).

[24] *Aetna Life Ins. Co. v. Indus. Comm'n*, 274 P. 139, 143 (Utah 1929).

stabilized,[25] and that claimants have to essentially start a new action for compensation when there has been either "a change in condition or new development" or when the previous award has shown itself to be inadequate.[26] Each new request for hearing receives its own case number and triggers all the procedures that a new request would, such as discovery. Indeed, we have described these additional hearings as "later claim[s] relating to the specified industrial injury."[27] Accordingly, Petitioners argue that the last event necessary for a claimant to gain a right to claim disability benefits is not the workplace accident, but the later stabilization or changed circumstance—the event that entitles the claimant to a new or changed award. Because the twelve-year period is tied to the date of accident, and not to the time that the worker becomes legally eligible to claim the additional benefits,[28] the statute can cut off a claimant's right to assert a claim and is accordingly a statute of repose.

¶ 15 Although this is a close question, the Petitioners present the better reading of section 34A-2-417(2)(a)(ii). The WCF would have us treat a claim for compensation as similar to a claim for personal injury in that an injured worker can only assert a claim once, though the actual payment amount may be modified at a later date. Workers' compensation claims, however, are a unique type of remedy. Indeed, we have rejected comparisons to personal injury awards in the past.[29] "Workers' compensation claims are best viewed

---

[25] *See Color Country Mgmt. v. Labor Comm'n*, 2001 UT App 370, ¶ 26, 38 P.3d 969.

[26] *Reinsurance Fund*, 2012 UT 76, ¶ 23 (citation omitted); *see also Sheppick v. Albertson's, Inc.*, 922 P.2d 769, 775 n.2 ("Such changes could include a deterioration of the former employee's condition or the discovery of a previously unnoticed injury." (citation omitted)).

[27] *Reinsurance Fund*, 2012 UT 76, ¶ 28.

[28] *See id.* ¶ 29 ("When Mr. Henningson did not improve as anticipated and was declared permanently and totally disabled by his physician in 1997, he was eligible to file an application for hearing seeking additional benefits because his award was inadequate.").

[29] *Stoker*, 889 P.2d at 411 ("These remedies, whether viewed individually or together, are not analogous to an ordinary lump-sum judgment that the common law provides for personal injury actions. Not only may benefits be paid over a period of time rather than in a
(Continued)

as a process, rather than as a discrete event . . . ."[30] Although a claim for compensation is, as we have stated, "one claim" for purposes of invoking the Commission's continuing jurisdiction, it can be made up of a series of claims, hearings, and awards.[31] The WCA already has a statute of limitations—section 34A-2-417(2)(a)(i)—which requires a claimant to file within six years of the first accrual of the claimant's right to invoke the Commission's jurisdiction. Section 417(2)(a)(ii) cuts off a claimant's right to file additional claims based on changed circumstances—even if those claims could not have been asserted prior to the expiration of the twelve-year period.

¶ 16 We have already described section 34A-2-417(2)(a)(ii) as a statute of repose that imposes "a twelve-year limit to the Commission's continuing jurisdiction," though this description was in dicta.[32] Our prior description of the statute was correct because it acts like a statute of repose and is not always tied to the date that the employee becomes eligible to maintain an action for compensation. As discussed above, section 417(2)(a)(ii) ends the continuing jurisdiction of the Commission to adjust awards in light of changed circumstances. The Commission's jurisdiction otherwise extends to hearing and deciding a claim for benefits upon "the discovery of a previously unnoticed injury,"[33] or when the Commission originally determined that the claimant was not due any benefits, but later became disabled.[34] Thus, there may be circumstances where a claimant was not entitled to any disability benefits until after the twelve-year period, because he or she did not discover the injury until after twelve years had expired. Because a claimant is "eligible to file an application for hearing seeking additional benefits because his award was inadequate"[35] only after the changed circumstances—

---

lump-sum judgment, but an award of benefits does not generally have the res judicata effect of a judgment.").

[30] *Color Country Mgmt.*, 2001 UT App 370, ¶ 26.

[31] *See Reinsurance Fund*, 2012 UT 76, ¶ 28.

[32] *Id.* ¶ 21 n.4. The context of the case was somewhat analogous to the present one, in that there was a worker who was claiming additional benefits beyond the twelve-year period. We held that the statute was inapplicable, however, because the worker's accident occurred before the amendment.

[33] *Sheppick*, 922 P.2d at 775 n.2.

[34] *See Ortega*, 2000 UT 24, ¶ 13.

[35] *See Reinsurance Fund*, 2012 UT 76, ¶ 29.

the discovery of the full extent of the injury resulting from the workplace accident—the twelve-year period is not tied to the accrual of the worker's right to claim benefits, and section 417(2)(a)(ii) should be interpreted as a statute of repose.

¶ 17 Having held that section 34A-2-417(2)(a)(ii) is a statute of repose, we now consider whether it violates the Open Courts Clause of the Utah Constitution by impermissibly abrogating a person's right to a remedy.[36] As discussed below, we conclude that it does not violate the Open Courts Clause and so withstands scrutiny under that constitutional provision.

## II. Open Courts Clause

¶ 18 The meaning of the Open Courts Clause of the Utah Constitution has "spawned extensive debate in our opinions."[37] The clause itself states:

> All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.[38]

---

[36] We note that in our companion case of *Petersen v. Labor Commission*, also decided today, we concluded that the statute at issue there, Utah Code section 35-1-65, did not operate as an unconstitutional statute of repose because it did not cut off a *previously* existing remedy. 2017 UT 87, ¶ 17, --- P.3d ---. Specifically, because no injured worker ever enjoyed the right of temporary total disability compensation more than eight years after an injury, section 35-1-65 did not cut off a previously existing remedy. In this case, section 34A-2-417(2)(a)(ii) was added to the WCA by amendment in 1999. Prior to that time, injured workers did enjoy the right of compensation for permanent total disability more than twelve years from the date of an accident. Because this amendment to the WCA took away a remedy guaranteed to a previous generation of workers, our precedent directs that we assess its constitutionality in light of the Open Courts Clause.

[37] *In re Adoption of B.Y.*, 2015 UT 67, ¶ 57, 356 P.3d. 1215.

[38] UTAH CONST. art. I, § 11.

In *Berry ex rel. Berry v. Beech Aircraft Corp.*, "[t]he court's majority . . . embraced a substantive conception of the open courts protection."[39] Since that case, we have held that, although the "legislature may create, define, and modernize the law[,] . . . it does not have unbridled power" to do so.[40] Thus, the Open Courts Clause acts as a substantive check on legislative power. And although our prior cases have viewed statutes of repose with some constitutional suspicion, "we have clearly stated that the open courts clause does not necessarily forbid all statutes of repose[,] but that such statutes can be constitutional when the possibility of injury and damage is highly remote and unexpected."[41] So, a statute of repose is not automatically unconstitutional, but can be upheld if it satisfies the test we adopted in *Berry*.

¶ 19 In *Berry*, we established a three-part test to determine whether a legislative act runs afoul of the Open Courts Clause. Under this test, we look first to whether the legislature has abrogated a cause of action.[42] If it has, we then determine whether "the law provides an injured person an effective and reasonable alternative remedy."[43] "[I]f there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective."[44]

¶ 20 The parties agree that if section 34A-2-417(2)(a)(ii) is interpreted as a statute of repose, it has abrogated an existing remedy and that the legislature has not provided an alternative remedy. Accordingly, the parties dispute only whether imposing this statute of repose eliminates a "clear social or economic evil" and, if it does, whether it does so in an "arbitrary or unreasonable" way. We address these two components of the test in turn.

---

[39] *In re Adoption of B.Y.*, 2015 UT 67, ¶ 57 (citing *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 680 (Utah 1985)).

[40] *Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.*, 782 P.2d 188, 191 (Utah 1989).

[41] *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 21, 974 P.2d 1194.

[42] *Laney v. Fairview City*, 2002 UT 79, ¶ 49, 57 P.3d 1007.

[43] *Berry*, 717 P.2d at 680.

[44] *Id.*

*A. Clear Social or Economic Evil*

¶ 21 The first component of our analysis of whether the legislature was justified in abrogating a remedy is to determine whether the legislature was acting in response to a "clear social or economic evil." In order to address the parties' arguments in this regard, however, we must first resolve a dispute that exists in our caselaw about the presumption of constitutionality of statutes under the *Berry* test. In a series of cases we have held or suggested that when a statute is challenged under the Open Courts Clause, and the statute is shown to abrogate a cause of action without providing for an alternate remedy, "we have, *de facto*, shifted from a presumption that the limiting statute is constitutional to a presumption that the statute is unconstitutional, placing the burden to show that the *Berry* test is satisfied upon those seeking to uphold the challenged statute."[45]

¶ 22 But more recently we have clarified that the view of the presumption of constitutionality we expressed in these cases is no longer good law. In *Judd v. Drezga*, "we recognize[d] an obligation of deference to legislative judgments in a *Berry* review, and to the extent this differ[ed] from our prior application of *Berry*, those prior applications [were] disavowed."[46] In that case, we looked to the

---

[45] *Lee v. Gaufin*, 867 P.2d 572, 591 (Utah 1993) (Zimmerman, J., concurring); *see also Laney*, 2002 UT 79, ¶ 63 (quoting with approval Justice Zimmerman's concurrence in *Lee v. Gaufin*); *Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶¶ 41–47, 67 P.3d 436 (Durham, C.J., dissenting) (stating that "our jurisprudence for many decades on this issue has provided a wealth of justification for the standard we have employed," and that "this court has consistently rejected the presumption of constitutionality of statutes challenged under the [Open Courts Clause]," in a portion of an opinion which garnered a majority of justices); *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1092–94 (Utah 1989) (rejecting other states' approach to the constitutionality of statutes of repose, which included "heavy reliance on the presumption of constitutionality generally accorded legislative enactments . . . coupled with the requirement that there be only a rational basis for the statutory enactment" and holding that the balancing between the right of a person to a remedy and the legislative purpose of "end[ing] the potential threat of a lawsuit to some construction professionals" "has been done by the open courts clause" in favor of the right to a remedy).

[46] 2004 UT 91, ¶ 11, 103 P.3d 135.

purpose the legislature included in the statute and stated that "[a]lthough the empirical truth of these findings is a matter of some dispute, we will not undertake the same investigation as the legislature."[47] We ultimately held that, "[w]hen an issue is *fairly debatable*, we cannot say that the legislature overstepped its constitutional bounds when it determined that there was a crisis needing a remedy."[48]

¶ 23 Although *Judd* apparently resolved this question, Petitioners argue that the deferential standard we adopted in *Judd* applies only when the legislature has made specific findings of purpose. They point to the fact that the statute at issue in *Judd* had "stated legislative findings" that there was "a crisis in the health care industry" justifying the statute.[49] Under Petitioners' approach, we would defer to "legislative judgments"[50] as to the presence of an evil to be rectified only where those judgments are clearly expressed, which they assert tracks the *Berry* test of looking to whether there is a "clear social or economic evil to be eliminated."[51]

¶ 24 Petitioners' approach ignores *Judd*'s reasoning and misstates its holding. In *Judd*, we looked not only to the legislative findings contained in the statute, but we also considered the investigation the legislature had done—"its data-gathering methods and conclusions"—in making those findings.[52] We noted that both sides cited "various studies and articles[] that ostensibly support their position."[53] We deferred to the legislature not because it had codified its findings, but because the legislature had resolved a policy dispute after researching and debating the issue. We noted that "[a] court is ill-suited to undertake investigation of such a nature" and held that "our power does not extend so far as to permit imposition of our views on such policy disputes."[54] Accordingly, "[o]ur inquiry under the 'clear social or economic evil' portion of the *Berry* test is . . .

---

[47] *Id.* ¶ 13.

[48] *Id.* ¶ 15 (emphasis added).

[49] *Id.* ¶¶ 13–15.

[50] *Id.* ¶ 11.

[51] *Berry*, 717 P.2d at 680.

[52] *Judd*, 2004 UT 91, ¶ 13.

[53] *Id.* ¶ 14.

[54] *Id.* ¶¶ 13–14.

limited" to a determination of "whether the legislature overstepped the bounds of its constitutional authority in enacting [the statute], not whether it made wise policy in doing so."[55] Thus, "[w]hen an issue is fairly debatable, we cannot say that the legislature overstepped its constitutional bounds when it determined that there was a crisis needing a remedy."[56]

¶ 25 Turning to the statute at issue in this case, although there are no codified legislative findings, there is an extensive record showing that this statute was contentiously debated in the legislature. Proponents of the bill pointed to the fact that a limitation on the ability of a worker to file for benefits helps insurance companies better manage their risks, informs them as to the amount of reserves they need to keep, and protects them against limitless litigation over old claims where causation had become tenuous.[57] They also stated that the bill would help employers by reducing the premiums they would have to pay, as insurance companies' base premiums on the number of potential, outstanding compensation claims that may be filed, which is dependent on the number of injured workers who may file claims.[58] These are the types of policy considerations that in previous cases we have found to justify a legislative abridgment of a legal remedy.[59]

¶ 26 Of course, there were and are a number of countervailing policy considerations, including the argument that there are only a few claims that would ever be adjudicated beyond twelve years, so the fiscal savings is minimal. Further, Petitioners argue that insurance companies and employers do not face a risk of litigating stale claims with old evidence, because the worker must have filed within the first six years and had his or her claim to benefits decided after a hearing in which a record of relevant evidence would be made. A subsequent filing would only look at the recent change in circumstances, where the evidence would be fresh, to determine whether it was caused by the original, well-documented workplace accident. Under *Judd*, however, it is not our place to investigate and balance these competing policy considerations.

---

[55] *Id.* ¶¶ 13, 15.

[56] *Id.* ¶ 15.

[57] *Id.* ¶ 16.

[58] *Id.*

[59] *See id.* ¶ 13; *Craftsman*, 1999 UT 18, ¶ 20.

¶ 27 Ultimately, "[a]lthough [Petitioners'] arguments are well taken, and the court may remain unconvinced of the wisdom of limiting [disability benefits] for severely injured victims like [Petitioners], our power does not extend so far as to permit imposition of our views on such policy disputes."[60] Because the issue in this case "is fairly debatable," "the views of a majority of members of this court should [not] prevail over those of the majority of the legislature."[61] Thus, we hold that there is a "clear social or economic evil" that was sought to be eliminated by section 34A-2-417(2)(a)(ii). This holding, however, does not end our analysis. We must now turn to a discussion of whether the statute of repose "is a reasonable, nonarbitrary method for achieving the legislature's stated purpose."[62]

### B. Arbitrary and Unreasonable Means

¶ 28 The second component of the *Berry* test's evaluation of the legislative enactment is to determine whether "the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective."[63] To do so, we look to whether the statute is "narrowly tailored"[64] or if it "cut[s] an unnecessarily wide swath through [the impacted] causes of action."[65] In general, a statute of repose "can be constitutional when the possibility of injury and damage is highly remote and unexpected."[66]

¶ 29 In this case, the statute cuts off a worker's right to file for benefits only if the changed circumstances warranting benefits — the development of the injury into a disability or the discovery of a previously unknown injury — accrues twelve years after the original accident. A cause of action that accrues before twelve years is actionable, and, so long as the worker is diligent in filing for benefits, the claim will not be cut off as the legislature specifically included a provision extending the Commission's jurisdiction to adjudicate an

---

[60] *Judd*, 2004 UT 91, ¶ 14.

[61] *Id.* ¶¶ 14 n.1, 15.

[62] *Id.* ¶ 15.

[63] *Berry*, 717 P.2d at 680.

[64] *Judd*, 2004 UT 91, ¶ 17.

[65] *Hirpa v. IHC Hosps., Inc.*, 948 P.2d 785, 794 (Utah 1997).

[66] *Craftsman*, 1999 UT 18, ¶ 21.

initiated claim even if the twelve-year timeframe expires.[67] Further, there is no time limit on the insurance company's or employer's responsibility to cover all medical treatment.[68]

¶ 30 Accordingly, the legislature's purpose in enacting the statute was to end prolonged and uncertain liability for both insurance companies and employers—and to reduce the associated insurance premiums. The legislature has narrowly tailored the statute to that purpose by cutting off only those claims that have somehow not manifested or stabilized after twelve years. Further, in selecting twelve years, the legislature has adopted a time period that far exceeds any statute of limitation for civil claims[69] and is equivalent to the longest period adopted by other states that have enacted similar statutes.[70] The statute "is targeted to control costs in one area where costs might be controllable," "gives insurers some idea of their potential liability," and does not reach beyond the narrow class of claims described above.[71] Accordingly, section 34A-2-417(2)(a)(ii) is a reasonable and non-arbitrary means of achieving the valid legislative purposes discussed above and withstands Open Courts Clause scrutiny.

*C. Response to Justice Lee's Concurrence*

¶ 31 In his concurrence, Justice Lee argues that we should overrule *Judd v. Drezga*[72] and adopt a new interpretation of the Open Courts Clause—an interpretation that would limit the legislature's ability to eliminate vested causes of action, but would impose no

---

[67] As noted above, the WCA provides for a limited extension of the Commission's jurisdiction in cases where "the employee is fully cooperating in a commission approved reemployment plan" or "the employee is actively adjudicating issues of compensability before the commission." UTAH CODE § 34A-2-417 (2)(c)(ii)(A)–(B).

[68] *See id.* § 34A-2-417(1)(a)–(b).

[69] The longest statute of limitation in Utah for any kind of personal injury is four years. *See id.* § 78B-2-307(3).

[70] Utah House Floor Debates, H.B. 358, 53rd Leg., 1999 Gen. Sess. (Feb. 26, 1999) (statements of Rep. John Swallow).

[71] *Judd*, 2004 UT 91, ¶¶ 16–17.

[72] Justice Lee's concurrence points primarily to *Berry ex rel. Berry v. Beech Aircraft Co.*, 717 P.2d 670 (Utah 1985), but *Judd v. Drezga*, 2004 UT 91, 103 P.3d 135, is this court's last iteration of *Berry.*

restriction on the authority of the legislature to eliminate causes of action prospectively. In his typical fashion, Justice Lee's arguments are thoughtful and scholarly. And in an appropriate case, they may well garner the support of a majority of the members of this court. But this is not the appropriate case. This is so for two reasons.

¶ 32 First, reaching the issue of whether *Judd* should be overturned is unnecessary to the resolution of this case.[73] Petitioners have not sought to have *Judd* overturned in favor of an Open Courts Clause interpretation that would yield a different result. Nor would the application of Justice Lee's new proposed interpretation yield a different result. He agrees with the majority that the Petitioners' claims fail.

¶ 33 Second, not only does Justice Lee unnecessarily reach the question of whether *Judd* should be overturned, he goes one step further by proposing a new interpretation of the Open Courts Clause—an interpretation that has not been proposed by the parties, much less briefed, and that would represent a dramatic departure from our existing precedent. This court has engaged over the last three decades in a sometimes contentious debate over the correct interpretation of the Open Courts Clause. We should not conclude this debate by overruling precedent in a case where it is unnecessary to reach the issue, and then *sua sponte* replace that precedent with a new interpretation.

¶ 34 That having been said, this opinion should not be construed as a comment upon the merits of Justice Lee's proposed new interpretation of the Open Courts Clause. Nor should it be read to signal an end to this court's debate over the interpretation of the Open Courts Clause. In the appropriate case, we may well revisit *Judd*, and we may well consider Justice Lee's proposed interpretation, or perhaps another. But we should grapple with

---

[73] Justice Lee argues that the resolution of the "long-festering problem" of our interpretation of the Open Courts Clause is justified due to the extensive supplemental briefing we requested and received in this case. *Infra* ¶¶ 36–37, 53–54. We asked, in part, whether we should uphold or overrule our past precedent establishing the substantive interpretation of the Open Courts Clause. We appreciate the excellent briefing provided by the parties in this case, but find it unnecessary to reach the question of whether *Judd* should be overturned.

issues of this magnitude in a case where doing so is necessary to the case's resolution.

## Conclusion

¶ 35 For the reasons discussed above, Utah Code section 34A-2-417(2)(a)(ii) is a statute of repose that is constitutional under the Open Courts Clause of the Utah Constitution. Accordingly, we affirm the Utah Labor Commission's order.

––––––––––––

ASSOCIATE CHIEF JUSTICE LEE, concurring in the judgment:

¶ 36 Today this court continues its gradual retreat from the balancing test set forth in *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). I welcome the retreat but I think we need to go further. *Berry* has outlived its usefulness. The time has come to overrule it.

¶ 37 In the decades since *Berry* our open courts jurisprudence has been marked by confusion, inconsistency, and ongoing revisionism. The briefing in this case, moreover, has highlighted the incompatibility of the *Berry* test with the text and original meaning of the Open Courts Clause. I would overrule *Berry*. I would replace it with a standard that is more transparent, more workable, and more in line with the terms and historical understanding of the guarantee of a right to open courts. And I would uphold the constitutionality of the challenged provisions of the Workers' Compensation Act under the revised standard that I would adopt.

¶ 38 The majority attempts to avoid the question of the viability of the *Berry* test. It says that it is "unnecessary" for us to reach the question whether the *Berry* line of cases "should be overturned" in order to resolve this case. *Supra* ¶ 32. Because the challenged workers' compensation provisions are, in the court's view, constitutional even under the *Berry* standard (as modified in *Judd v. Drezga*, 2004 UT 91, 103 P.3d 135), the majority preserves the existing standard. *Supra* ¶ 32. The court defends its approach as a matter of judicial restraint and avoidance. And it criticizes my analysis as both "*sua sponte*" and unnecessary. *Supra* ¶ 33.

¶ 39 I cannot see how this is a matter of avoidance. Or how my approach can be deemed improper. The parties have presented extensive briefing on the question of the textual and historical basis for our *Berry* framework. And they have invited us to repudiate the *Berry* framework in light of one that is more in line with the original meaning of the Open Courts Clause. My decision to take the parties

up on their invitation is hardly a *sua sponte* act. *See* sua sponte, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining *sua sponte* as "[w]ithout prompting or suggestion"). The standard that I propose admittedly draws a line that differs somewhat from that proposed by any of the parties. Instead of either retaining *Berry* or endorsing the view espoused in past dissenting opinions in the court I am advocating something of a middle ground. But surely there is no bar on a judge defining the law in a manner that strikes a balance between the extremes proposed by the parties. As judges we always retain the prerogative—if not the duty—to discern the applicable standard of law as we understand it (and without being bound by the legal standards espoused by the parties).[74] That is what I seek to do here. I am trying to do my level best to articulate the governing law in response to the questions framed by the parties' briefing.

¶ 40 The majority, moreover, is not really avoiding the question of the viability of the standard set forth in the *Berry* line of cases. It is openly affirming the viability of the standard by applying it in this case. All that is really avoided by the court is a transparent statement of an analytical basis for retaining the *Berry-Judd* standard. And the refusal to offer that kind of explanation doesn't strike me as a matter of judicial restraint.

¶ 41 I think we need to reexamine *Berry* and openly decide whether it should be retained. And I think we should overrule it and replace it with a standard that is more workable and more faithful to the terms of the Open Courts Clause.

¶ 42 I explain the basis for my conclusions in the paragraphs below. First I offer some background on the *Berry* standard as it has been applied over time and by the majority today. Then I explain the basis for my conclusion that *Berry* is not entitled to deference as a matter of *stare decisis*. For that reason I next return to first principles—to a consideration of the text and original meaning of the Open Courts Clause, which in my view require us to repudiate *Berry* in favor of a more limited standard that would foreclose only the legislative abrogation of *vested* causes of action. Because the Workers' Compensation Act does not cross that line, I close with my conclusion that we should uphold the Workers' Compensation Act under the revised standard that I would apply.

---

[74] *See Patterson v. Patterson*, 2011 UT 68, ¶ 20, 266 P.3d 828 (noting our "responsibility" to apply the law, refusing to be bound only to the parties' arguments—which excluded a controlling statute).

Lee, A.C.J., concurring in the judgment

### I. *BERRY*

¶ 43 In *Berry* we held that the Open Courts Clause of the Utah Constitution limits the power of the legislature to abrogate legal remedies recognized in the common law. *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 680 (Utah 1985). *Berry* says that the legislature has the authority to cut back on existing causes of action if it "provides an injured person an effective and reasonable alternative remedy" or, absent such a substitute, if the court determines that the legislature was pursuing a reasonable means of eliminating a "clear social or economic evil." *Id.*

¶ 44 For many years this court viewed the *Berry* standard as a high bar. In cases in which the legislature abrogated a common law remedy and provided no substitute, we effectively flipped the usual presumption of constitutionality—embracing what amounted to a *de facto* presumption of unconstitutionality.[75] And we upheld legislation abrogating an existing remedy without the provision of a substitute only if the party defending the statute presented evidence

---

[75] *Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 46, 67 P.3d 436 (Durham, C.J., writing for the majority on this issue) ("Contrary to the position taken by the lead opinion, this court has consistently rejected the presumption of constitutionality of statutes challenged under the remedies clause of article I, section 11."); *Hipwell ex rel. Jensen v. Sharp*, 858 P.2d 987, 988 n.4 (Utah 1993) ("A majority of the [*Condemarin*] court agreed that because the [O]pen [C]ourts [C]lause was implicated, the cap must be analyzed under a heightened level of scrutiny for constitutional purposes."); *Lee v. Gaufin*, 867 P.2d 572, 591 (Utah 1993) (Zimmerman, J., concurring in result) ("[W]hen we have found a statute to limit a right protected by the open courts provision, we have, *de facto*, shifted from a presumption that the limiting statute is constitutional to a presumption that the statute is unconstitutional, placing the burden to show that the *Berry* test is satisfied upon those seeking to uphold the challenged statute."); *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 366 (Utah 1989) (holding that a statute implicating the Open Courts Clause required a heightened level of scrutiny for constitutional purposes); *id.* at 368 (Zimmerman, J., concurring in part) ("Because the interests at stake are specifically protected by the constitution, the presumption of validity that normally attaches to legislative action must be reversed once it is shown that the enactment under scrutiny does, in fact, infringe upon the interests enumerated in article I, section 11.").

sufficient to persuade us of the weight and significance of the "social or economic evil" at issue.[76]

¶ 45 Many of our decisions in this field were announced by a divided court.[77] A principal hallmark of the *Berry* test has been the

---

[76] *Berry*, 717 P.2d at 680; *see, e.g.*, *Hirpa v. IHC Hosps., Inc.*, 948 P.2d 785, 793–94 (Utah 1997) (upholding the abrogation of a remedy under the Good Samaritan Act; concluding that the common law "disincentives . . . licensed medical providers" from "render[ing] medical care," constituting a "social evil"); *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 20–23, 974 P.2d 1194 (upholding the builder's statute of repose, Utah Code section 78-12-25.5; noting that the legislature identified two "clear social and economic evils"—"liability insurance costs and records storage costs"—and concluding that the statute is a reasonable and nonarbitrary "means to eliminate the stated evils").

[77] *Wood*, 2002 UT 134, ¶ 38 (Wilkins, J., joined by Durrant, A.C.J., and joined in part by Howe, J.) (majority opinion holding that the Utah Wrongful Life Act does not violate the Open Courts Clause); *id.* ¶ 56 (Durham, C.J., dissenting, joined by Russon, J.) (concluding that the Utah Wrongful Life Act violated the Open Courts Clause); *Lyon v. Burton*, 2000 UT 19, ¶¶ 53–66, 5 P.3d 616 (Stewart, J., joined by Durham, A.C.J., advocating a dissenting view on the open courts issue) (concluding that the damages cap in Utah Code section 63-30-4 should be struck down as unconstitutional under the Open Courts Clause); *id.* ¶ 83 (Howe, C.J., concurring in result, joined by Russon, J.) (concluding that the statute should be upheld under the Open Courts Clause because "the legislature should be accorded broad discretion in providing an alternative remedy"); *id.* ¶ 88 (Zimmerman, J., concurring in the result) (asserting that the statute should be upheld and that *Berry* should be overruled); *Day v. State ex rel. Utah Dep't of Pub. Safety*, 1999 UT 46, ¶¶ 46–48, 980 P.2d 1171 (Stewart, J., joined by Durham, A.C.J., and Russon, J., and with Howe, C.J., concurring in the result) (majority decision striking down statute under the Open Courts Clause where the legislature did not identify any social or economic evil); *id.* ¶¶ 52–54 (Zimmerman, J., dissenting) (asserting that the court exceeded its authority in assessing the legislature's justifications for the statute); *Craftsman*, 1999 UT 18, ¶ 23 (Russon, J., joined by Stewart, J., and with Howe, J., "concurring with reservation") (majority decision upholding the constitutionality of a statute under the Open Courts Clause); *id.* ¶ 32 (Stewart, J., joined by Durham, A.C.J.) (writing

(Continued)

consistent call for its repudiation.[78] For good reasons: *Berry* has spawned confusion and uncertainty from the outset, and its basis in the text and original meaning of the Open Courts Clause has quite credibly been questioned.[79]

¶ 46 Our open courts precedent is also marked by a gradual retreat from the *Berry* standard. A significant step in the retreat came in *Judd v. Drezga*, 2004 UT 91. There we disavowed the notion of independent judicial evaluation of the "social or economic evil" put forward in defense of legislation abrogating an existing cause of action—at least in circumstances in which the legislature has made explicit findings on that question. *Id.* ¶¶ 11, 13. In *Judd*, the "empirical truth" of legislative findings of a "clear social or economic evil" was conceded to be a "matter of some dispute." *Id.* ¶ 13. Yet we declined to "undertake the same investigation as the legislature." *Id.*

---

separately in response to Justice Zimmerman); *id.* ¶ 108 (Zimmerman, J., concurring in the result) (arguing that *Berry* should be overruled); *Condemarin*, 775 P.2d at 366 (Durham, J., with Zimmerman, J., and Stewart, J., concurring in part) (majority decision striking down provision of Governmental Immunity Act limiting amount of claim against uninsured government entity because of injury or death, as applied to University Hospital); *id.* at 375 (Hall, C.J., dissenting, joined by Howe, A.C.J.) (disagreeing with the majority's "depart[ure] from the traditional rational basis standard of review in assessing the constitutionality of the Utah Government Immunity Act").

[78] *Laney v. Fairview City*, 2002 UT 79, ¶ 89, 57 P.3d 1007 (Wilkins, J., concurring in part and dissenting in part) (opining that "the *Berry* test is a straw man analytical framework that permits one to justify a predetermined outcome"); *Craftsman*, 1999 UT 18, ¶ 108 (Zimmerman, J., concurring in the result) (asserting that *Berry* "has proven to be unworkable," "is subject to manipulation," "leads to absurd results," and "distorts our relationship with the legislature").

[79] *Laney*, 2002 UT 79, ¶ 94 (Wilkins, J., concurring in part and dissenting in part) ("[T]he accompanying *Berry* test has proven to create more problems than it has solved. Compelling to me is that *Berry* has proven to be unworkable over a period of 17 years, has not been adhered to unanimously, has been questioned and chastised by members of this court, including one who agreed with the *Berry* interpretation initially, has been criticized by legal scholars, and presents separation of powers problems.").

Instead we held that the legislature is within its bounds when the basis for its findings "is fairly debatable." *Id.* ¶ 15.

¶ 47 This case is an important one in this significant series. The parties ask us either to reinforce the *Berry* standard or to extend the *Judd* restriction on that standard a step further. Mr. Waite says that the *Berry* requirement of a "clear social or economic evil" necessarily requires independent judicial evaluation of the policies advanced in favor of the workers compensation provision at issue. And he views *Judd* as a limited exception to the rule—under which we defer to the legislature (asking only where the social or economic evil is a matter of *fair debate*) only in the face of express legislative findings. The Labor Commission, on the other hand, asks us to extend the *Berry-Judd* standard to all cases, whether or not there are express legislative findings. It says that courts should never engage in an independent assessment of whether there is a sufficient "social or economic evil" to support the abrogation of an existing remedy.

¶ 48 This is an important question. Resolving it implicates not just a policy question of whether to extend *Judd* but the bigger jurisprudential question of the legal basis for the *Berry* standard that started us down this path. That is why we issued a supplemental briefing order in this case—asking the parties to present argument on whether the "text and original meaning" of the Open Courts Clause "provide a substantive guarantee against the elimination of remedies recognized by the law in the past"; on whether *Berry* and its progeny are entitled to deference "under the *stare decisis* standards discussed in *Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 20-41," 345 P.3d 553; on whether the test announced in *Berry* is the "proper test" for assessing legislation abrogating existing remedies; and on whether "the elements of the *Berry* test should be revised or adjusted."

¶ 49 The parties and their amici—represented by able counsel—presented extensive briefing on these important questions. Yet the majority attempts to avoid them. It does not expressly consider the constitutional propriety of the *Berry* test (as adjusted in *Judd*). And it offers no analysis of the propriety of preserving these standards as a matter of *stare decisis*. Instead it claims the important questions presented—and argued by the parties—are "unnecessary to the resolution of this case." *Supra* ¶ 32. Thus, the court upholds the *Berry* standard on principles of judicial restraint and avoidance. *Id.*

¶ 50 I find no logical or legal basis for this approach. In resolving this case by applying and extending the *Berry-Judd* standard, the majority is continuing to uphold the standard; it is simply

Lee, A.C.J., concurring in the judgment

withholding the basis for its analysis of these questions from public view.

¶ 51 The decision to extend *Judd* (and further limit *Berry*) may be a step in the right direction. It is if the *Berry* framework is either not true to the text and original meaning of the Open Courts Clause or if *Berry* is not entitled to deference as a matter of *stare decisis*. But the majority doesn't offer those (or other) reasons for this decision. It just assumes the propriety of the *Berry-Judd* framework. And that strikes me as problematic. It is "emphatically" our "province and duty . . . to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). We should fulfill that duty here.

¶ 52 The decision only to extend *Judd*, moreover, may be insufficient. If the *Berry* framework is not the correct constitutional standard and if it is not entitled to *stare decisis* respect then we should repudiate it entirely.

¶ 53 The lack of an explicit rationale in support of the court's decision leaves lower courts and future litigants without the benefit of much-needed guidance in this long-muddled field. The watered-down *Berry-Judd* standard may be the substantial equivalent of federal "rational basis" review. If it is then the substantive component of the open courts guarantee has been effectively diluted out of existence.[80] Alternatively, the "fairly debatable" formulation may imply some level of scrutiny beyond that required as a matter of federal constitutional law. The court doesn't tell us. And by kicking this can down the road the majority is further perpetuating a long-festering problem—our establishment of a legal regime that has long been fueling costly litigation and extensive uncertainty about the scope of the power of our legislature to cut back on common law remedies.

¶ 54 We should stop kicking this can down the road. We should address the viability of the *Berry* test head-on. I would do so here.

## II. *STARE DECISIS*

¶ 55 A threshold question presented is whether our *Berry* line of cases is entitled to deference as a matter of *stare decisis*. We asked the

---

[80] *See Wood*, 2002 UT 134, ¶ 43 (Durham, C.J., writing for majority on this issue) (concluding that "most, if not all, [article I] rights have generated some form of heightened judicial scrutiny" and that a "mere rational basis is insufficient for the legislature to intrude upon or eliminate" such rights).

parties to present arguments on this question under the standards set forth in our opinion in *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553. And that briefing persuades me that *Berry* and its progeny are ripe for reconsideration.

¶ 56 A key question under *Eldridge* is "how firmly" a line of "precedent has become established in the law since it was handed down." 2015 UT 21, ¶ 22. In evaluating this question, we consider "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* We also assess "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Id.*

¶ 57 The point of this inquiry is to balance the important goal of maintaining stability in the law against our ongoing commitment to getting the law "right." The first-listed set of considerations is aimed at assessing the downsides of overruling precedent. If a law is working well in practice and sustains significant reliance interests, it may be costly to reform the law by overruling precedent. And that is a strike in favor of deference to precedent. The second consideration goes to the upside of overruling an erroneous precedent. The more clearly errant a prior decision, the greater the need to set it aside in advancing our commitment to the rule of law.

¶ 58 The argument for overruling a prior decision is strongest when the costs of overruling (from a reliance or stability standpoint) are low and the benefits (from a rule of law standpoint) are high. In my view that is the case here. *Berry* has never become "firmly" established. Quite the contrary, as noted, this decision has spawned extensive debate and ongoing revisionism (which continues in the majority opinion today). The *Berry* standard has not worked well "in practice." Litigants and courts have long struggled with how to define and implement the standards set forth in these cases.[81] The

---

[81] *See supra* ¶ 45 n.77 (highlighting the division among members of the court in the application of the *Berry* standard in our cases); *Laney v. Fairview City*, 2002 UT 79, ¶ 93, 57 P.3d 1007 (Wilkins, J., concurring in part and dissenting in part) (noting that "Justice Zimmerman, an initial *Berry* proponent, reluctantly reached the conclusion that the *Berry* interpretation of the Open Courts Clause and its progeny do not provide a workable analytical framework" (citations omitted)); *id.* ¶ 94 (Wilkins, J., concurring in part and dissenting in part) (noting "that *Berry* has proven to be unworkable

(Continued)

stated standards, moreover, are inherently fuzzy and difficult to apply with any predictability.[82] This is simply not a field in which a litigant can claim that substantial "reliance" on our case law "would create injustice or hardship if it were overturned." So the costs of repudiating the *Berry* framework are in my view limited.

¶ 59 The benefits, on the other hand, seem to me to be substantial. The *Berry* decision itself upset more than seventy years of settled precedent.[83] And as explained in some detail below, there is little or no support in the text or original meaning of the Open Courts Clause for the *Berry* standard. This is just not a case in which we can find persuasive "the authority and reasoning on which th[is] precedent was originally based." *Eldridge*, 2015 UT 21, ¶ 22.

¶ 60 For these reasons I would take up the invitation to revisit the proper standard for assessing the scope of the legislature's power

---

over a period of 17 years, has not been adhered to unanimously, has been questioned and chastised by members of this court, including one who agreed with the *Berry* interpretation initially, has been criticized by legal scholars, and presents separation of powers problems"); *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 108 (Zimmerman, J., concurring in the result) (asserting that the *Berry* test "has proven to be unworkable," "is subject to manipulation," "leads to absurd results," and "distorts our relationship with the legislature").

[82] *See Laney*, 2002 UT 79, ¶ 89 (Wilkins, J., concurring in part and dissenting in part) (asserting that the *Berry* "test permits a majority of this court to substitute its judgment of what constitutes good public policy for the judgment of the legislature").

[83] *Compare Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 680 (Utah 1985) (establishing for the first time in 1985 a constitutional limitation on legislative authority to prospectively alter the law giving rise to legal rights), *with Union Sav. & Inv. Co. v. Dist. Court of Salt Lake City*, 140 P. 221, 225 (Utah 1914) (interpreting the clause to require that the "courts must always be open to all alike" and precluding the legislature from "curtailing" this right of access), *and Brown v. Wightman*, 151 P. 366, 366–67 (Utah 1915) (reiterating that the clause imposes "a limitation upon the Legislature to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy").

to abrogate remedies recognized in the common law. I would not feel foreclosed from so doing by the doctrine of *stare decisis.*

## III. THE ORIGINAL MEANING OF THE OPEN COURTS CLAUSE

¶ 61 The Open Courts Clause is not unique to Utah. Most states have some variation on this sort of provision.[84] And there is widespread agreement in the historical record that the language of the clause is rooted in principles passed down from as far back as England's Magna Carta.[85] So, to uncover the original meaning of this clause, we should treat its language as written in the language of the law[86]—as a legal term of art.[87] I would therefore frame my interpretation of the Open Courts Clause with an understanding of the open courts case law in place at the time of the adoption of the Utah Constitution.

---

[84] *See* Michael J. DeBoer, *The Right to Remedy by Due Course of Law—a Historical Exploration and an Appeal for Reconsideration*, 6 FALKNER L. REV. 135, 137 n.3 (2014) (identifying constitutional open courts clauses in Alabama, Arkansas, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, Wisconsin, and Wyoming).

[85] *See, e.g.*, *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 674 (Utah 1985) (noting that the clause "originated with the Magna Carta").

[86] Michael B. Rappaport & John O. McGinnis, *The Constitution and the Language of the Law* 7–8 (San Diego Legal Studies Paper No. 17-262 March 8, 2017).

[87] *See Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, --- P.3d --- ("A 'cardinal rule of statutory construction' says that a legislature's use of an established legal term of art incorporates 'the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)). This same principle applies in the context of constitutional interpretation. Where the terms employed in the constitution have a well-established legal meaning, we should interpret them consistent with that meaning.

¶ 62 Nineteenth-century open courts cases from other states are instructive in discovering the original public meaning of this provision at the time of Utah's statehood in 1896.[88] They make clear the meaning of the terms of art employed in the clause during the time period in which Utah adopted its similar provision. And based on those cases, I conclude that the *Berry* formulation is wrong. I find no basis for an open courts prohibition on legislative abrogation of a common law right of action—much less for the standard set forth in the *Berry* line of cases.

¶ 63 That said, I do not agree with the broad conclusion articulated in some prior opinions of members of this court—stating that the Open Courts Clause provides only a *procedural* limitation, and has no effect on the legislature's *substantive* power to regulate.[89] Instead, and as explained, I find a historical basis for a limited restriction on the legislature's substantive power to abrogate a common law cause of action: To the extent a given cause of action was *vested* as of the time of the legislature's enactment, the Open Courts Clause prohibits retroactive abrogation of such claims.

---

[88] My analysis is based on a review of all pre-statehood cases listed in the Westlaw citing references for the open courts provisions of each state that had enacted a clause prior to Utah's statehood.

[89] *See Laney v. Fairview City*, 2002 UT 79, ¶ 85, 57 P.3d 1007 (Wilkins, J., concurring in part and dissenting in part) (urging that *Berry* be overruled "in favor of the more procedural interpretation of the Open Courts Clause advanced in our jurisprudence prior to, and since, *Berry*"); *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 120, 974 P.2d 1194 (Zimmerman, J., concurring in result) (concluding that "the constitutional protections of article I, section 11 are procedural, not substantive"). *Contra Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 13, 116 P.3d 295 ("[T]he [O]pen [C]ourts [C]lause provides more than procedural protections; it also secures substantive rights, thereby restricting the legislature's ability to abrogate remedies provided by law."); *Laney*, 2002 UT 79, ¶ 30 ("Throughout our state's history, this court has consistently recognized that the plain meaning of the guarantee 'impose[s] some *substantive* limitation on the legislature to abolish judicial remedies in a capricious fashion.'" (alteration in original) (emphasis in original) (quoting *Craftsman*, 1999 UT 18, ¶ 36 (Stewart. J, concurring))).

Lee, A.C.J., concurring in the judgment

## A. Nineteenth-Century Case Law

¶ 64 I find no basis in the nineteenth-century cases to conclude that the Open Courts Clause limits the legislature's general power to abrogate an existing remedy. At most, the nineteenth-century open courts cases recognized a limit on the abrogation of a *vested* claim. And in that context, the courts sometimes spoke of the question whether the legislature had preserved an adequate substitute remedy. But the broad notion of an open courts limitation on legislative power to reform the scope of the injuries or claims protected by our substantive law was no part of open courts jurisprudence in the relevant time frame.

¶ 65 The nineteenth-century cases addressed a range of issues: the availability of a forum to assert a legal claim[90]; filing fee

---

[90] *See Ouachita Baptist Coll. v. Scott* 42 S.W. 536, 537 (Ark. 1897) (applying principles of constitutional avoidance and interpreting statute in a manner that provided a forum for the parties to raise their claims); *Sellars v. Myers*, 34 N.E. 496, 497 (Ind. App. 1893) (holding that the Open Courts Clause protects the right "not only to institute . . . suit, but to prosecute to final judgment, unless he has forfeited this right by his vexatious conduct"); *Liberty Twp. Draining Ass'n v. Brumback*, 68 Ind. 93, 95–97 (1879) (applying principles of constitutional avoidance and interpreting statute to allow challenge to the regularity of proceedings not just amount of damages caused by an appropriation of lands to railroad); *State v. Rightor*, 2 So. 385, 386–87 (La. 1887) (opinion of Todd, J.) (noting the role of the Open Courts Clause in protecting against an injunction being issued to stop a court of competent jurisdiction from hearing a case); *Davis v. Pierse*, 7 Minn. 13, 18 (1862) (law prohibiting those aiding the rebellion against the United States from maintaining any suit in courts within Minnesota violated Open Courts Clause, among other constitutional provisions); *Agin v. Heyward*, 6 Minn. 110, 115 (1861) ("The bill of rights declares that every person is entitled to a certain remedy in the laws, for all injuries which he may receive in his person, property or character. This includes the enforcement of rights as well as the redress of wrongs. But how can we carry this provision or declaration into effect, if we deny, to the tribunals, in which the judicial power is vested, jurisdiction in any given case? There must of necessity, therefore, be some court of general jurisdiction, and among those established by the constitution, the District Court is the only court not limited by express words—the only one not in fact prohibited from entertaining original jurisdiction

(Continued)

requirements and amounts[91]; the impact of statutes of limitation and repose on court access[92]; vested rights, including the degree to which

---

beyond specified limits." (citation omitted)); *Balt. & O.R. Co. v. Stankard*, 46 N.E. 577, 578–79 (Ohio 1897) (holding that a contract provision foreclosing any recourse to the courts was invalid under the Open Courts Clause); *Mullen v. Peck*, 31 N.E. 1077, 1079 (Ohio 1892) (discussing Open Courts Clause issue as right to have your "day in court"); *McClain v. Williams*, 73 N.W. 72, 74 (S.D. 1897) ("The provisions of section 20 [for open courts] . . . are satisfied by a trial in a court of competent jurisdiction, in which the right to trial by jury, in proper cases, is afforded . . . . None of the provisions of the constitution prohibit the legislature from limiting appeals to a defined class of cases . . . ."); *Dodd v. Weaver*, 34 Tenn. (2 Sneed) 670, 672 (1855) ("The court cannot be closed; but must be open to the injured party, who is entitled to 'remedy by due course of law.'" (citation omitted)).

[91] *See Lassitter v. Lee*, 68 Ala. 287, 290 (1880) (holding that where the law establishes "a condition precedent [that] is so unreasonable as to seriously impede, impair or cripple the rights designed to be guaranteed by these articles of the constitution, it can not be upheld or sustained by the courts" (citations omitted)); *Wilson v. McKenna*, 52 Ill. 43, 48–49 (1869) (holding unconstitutional a requirement to pay a tax before challenging it); *Succession of Grover*, 22 So. 313, 315 (La. 1897) (holding bond requirement for costs was not unreasonable under Open Courts Clause); *Knee v. Balt. City Passenger Ry. Co.*, 40 A. 890, 893 (Md. 1898) (discussing reasonableness of fees and propriety at common law and distinguishing these fees from historical payments made to expedite or slow down a case); *Lommen v. Minn. Gaslight Co.*, 68 N.W. 53, 54 (Minn. 1896) (discussing original legal term of art meaning of "justice freely and without purchase"); *Dutcher v. Culver*, 24 Minn. 584, 589–90 (1877) (upholding requirement of posting security as a prerequisite to asserting a claim for replevin); *Willard v. Bd. of Cty. Comm'rs of Redwood Cty.*, 22 Minn. 61, 64–65 (1875) (upholding provision requiring payment of costs); *State ex rel. Davidson v. Gorman*, 41 N.W. 948, 949–50 (Minn. 1889) (striking down requirement to pay tax assessment prior to challenging the assessment); *Adams v. Corriston*, 7 Minn. 456, 461 (1862) ("We can see no valid objection to a reasonable fee of this kind. The constitution does not guar[]antee to the citizen the right to litigate without expense, but simply protects him from the imposition of such terms as unreasonably and injuriously interfere with his right to a remedy in the law, or impede the due

(Continued)

administration of justice."); *Weller v. City of St. Paul*, 5 Minn. 95, 100–01 (1860) (reversing dismissal of action based on failure to comply with requirement to pay all taxes owed with interest as a condition precedent to challenging the assessment); *State v. McCarver*, 20 S.W. 1058, 1058–59 (Mo. 1893) (discussing the right to be heard—"open to every person"—and finding that the inability to pay transcript fee due to indigence cannot bar from having case decided); *Perce v. Hallett*, 13 R.I. 363, 364 (1881) ("The provision has a history which sheds light on its meaning. It was borrowed from Magna Charta, and in England the generality of jurists and legislators have supposed and acted on the supposition that it does not prohibit such fees. The better opinion is that it was designed to abolish, not fixed fees, prescribed for the purposes of revenue, but the fines which were anciently paid to expedite or delay law proceedings and procure favor." (citation omitted)); *Spalding v. Bainbridge*, 12 R.I. 244, 244 (1879) ("We certainly should not dismiss the suit, if it clearly appeared that the non-compliance was because of the plaintiff's inability on account of poverty."); *Whittaker v. City of Janesville*, 33 Wis. 76, 90 (1873) (applying principles of constitutional avoidance to allow equitable claim to be raised in opposition to allegedly unlawful tax assessment).

[92] *See Thornton v. Turner*, 11 Minn. 336, 339–40 (1866) (interpreting statute not to impose statute of repose because to do so would violate the Open Courts Clause); *Baker v. Kelley*, 11 Minn. 480, 491–94 (1866) (finding unconstitutional a statute of limitations as too short and cutting off a cause of action in the law before it can accrue); *Preston v. Drew*, 33 Me. 558, 560–63 (1852) (applying constitutional avoidance and interpreting a statute to allow replevin of unlawfully confiscated liquors because the property rights in the confiscated liquors had vested, but noting that it would be within the power of the legislature to prospectively declare that no one may acquire a property interest in liquors on account of their adverse effects to society); *Byers v. Penn. R.R. Co.*, 5 Pa. D. 683, 683–86 (Pa. Ct. Com. Pl. 1896) (striking down a statute of limitations on an as applied challenge brought by litigants whose cases were pending when the act was passed because to apply the act to these cases would deprive the litigants of a vested right to recover under the law that existed at the time they filed their claims). *But see Hill v. Lund*, 13 Minn. 451, 452–53 (1868) (concluding that a reasonable statute of limitations does not violate the Open Courts Clause).

the legislature could retroactively alter the law governing a cause of action that accrued prior to the new legislation[93]; the sale of justice, including one-sided attorney fee provisions and other unequal burdens in litigation[94]; unnecessary delay, including statutes staying

---

[93] *See Parker v. Sanders*, 46 Ark. 229, 234–36 (1885) (holding that vested rights do not include rights in a particular procedure for adjudicating claim or particular remedies); *Commercial Bank of Natchez v. Chambers*, 16 Miss. (8 Sneeds) 9, 56–58, 61 (Miss. Err. & App. 1847) (holding that legislative enactments that undermine vested rights are contrary to Open Courts Clause); *Lafferty v. Shinn*, 38 Ohio St. 46, 48–49 (1882) (noting that shortening a limitation period as to existing rights might violate the Open Courts Clause*);* *Templeton v. Linn Cty.*, 29 P. 795, 795–97 (Or. 1892) (reasoning that while vested rights cannot be deprived, no one can have a vested right in the general state of the law); *Menges v. Dentler*, 33 Pa. 495, 498–99 (1859) ("The law which gives character to a case, and by which it is to be decided (excluding the forms of coming to a decision), is the law that is inherent in the case, and constitutes part of it when it arises as a complete transaction between the parties. If this law be changed or annulled, the case is changed, and justice denied, and the due course of law violated."); *Byers*, 5 Pa. D. at 683–86 (holding that as to a cause of action that has already accrued the legislature cannot enact a law eliminating the claim retroactively); *Von Baumbach v. Bade*, 9 Wis. 559, 576–80 (1859) (citing U. S. Supreme Court cases holding that existing laws of remedies are a legal backdrop relied on by parties entering contracts such that changing the remedies may impair the vested rights if the changes upset reliance interests).

[94] *See Randolph v. Builders' & Painters' Supply Co.*, 106 Ala. 501, 501 (1895) (ruling one-sided attorney fee provision violated Open Courts Clause placing litigants on an unequal footing); *Kan. Pac. Ry. Co. v. Mower*, 16 Kan. 573, 582–83 (1876) (rejecting an open courts challenge to a one-sided attorney fee statute); *Russell v. Belcher*, 76 Me. 501, 503–04 (1884) (linking judicial disqualification requirements to the requirement that "justice shall be administered freely and without sale"); *Cameron v. Chi., Milwaukee & St. Paul Ry. Co.*, 65 N.W. 652, 653–54 (Minn. 1896) (upholding attorney fee provision); *Lommen*, 68 N.W. at 54 (rejecting an open courts challenge to a law requiring the party requesting a "struck jury" pay the costs associated with the procedure, looking to the original term of art understanding of "justice freely and without purchase"); *Chi., St. Louis & New Orleans R.R. Co. v. Moss*, 60 Miss. 641, 648–52 (1882) (holding that one-sided

(Continued)

execution of judgments or delaying specific cases[95]; and the scope of the public's right to observe legal proceedings.[96]

¶ 66 Not surprisingly, this focus on court access to vindicate vested legal rights is reflected in the text of Utah's Open Courts Clause. Our clause, which contains language similar to that adopted by other states, reads as follows:

> All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

UTAH CONST. art. I, § 11. The phrases "courts shall be open" and "administered without denial or unnecessary delay" speak unequivocally to access to the courts. In light of my research, I would hold that the phrase "for an injury done to him in his person,

---

attorney fee provision violated the clause as imposing unequal access or advantage in asserting a claim); *Vierling v. Stifel Brewing Co.*, 15 Mo. App. 125, 132–33 (1884) (discussing term of art meaning of "sale of justice" going back to Magna Carta); *Helena Steam-Heating & Supply Co. v. Wells*, 40 P. 78, 79–80 (Mont. 1895) (discussing one-sided attorney fees); *Wortman v. Kleinschmidt*, 30 P. 280, 284–85 (Mont. 1892) (same).

[95] *See Bumgardner v. Howard Cty. Cir. Ct.*, 4 Mo. 50, 51 (1835) (concluding that law postponing execution of a judgment in particular cases violated Open Courts Clause protection against delay of justice); *City of Toledo v. Preston*, 34 N.E. 353, 355–56 (Ohio 1893) (discussing issue of delay with respect to hearing a claim); *Townsend v. Townsend*, 7 Tenn. (Peck) 1, 21 (1821) (holding that statute delaying cases for two years is unconstitutional).

[96] *See State v. Rogers* 19 So. 909, 912–13 (Ala. 1895*)* (determining that public board at issue was not exercising judicial power so it was not required to meet in public); *Swann v. Kidd*, 79 Ala. 431, 432 (1885) ("This clause is known to have been taken in substance from *Magna Charta*; and history shows that its chief purpose was to assail the existing evil of anciently holding courts in clandestine sessions, and of paying fines to the king and his officers, for delaying or expediting law-suits, and for obtaining justice.").

property or reputation, shall have remedy by due course of law" reinforces the principle of access to the courts to vindicate *vested* legal rights. But it does not mean that the legislature cannot prospectively adjust the substantive law as it deems appropriate.

## B. Utah Open Courts Clause Jurisprudence

¶ 67 Much of what we said in *Berry ex rel. Beech v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), is consistent with the original meaning of the Open Courts Clause—including the conclusion that the Open Courts Clause is implicated by a statute of repose. In *Berry* we indicated that "[t]he clear language of the section guarantees access to the courts and a judicial procedure that is based on fairness and equality." *Id.* at 675 (citations omitted). The *Berry* court further asserted that

> the framers of the Constitution intended that an individual could not be arbitrarily deprived of effective remedies designed to protect basic individual rights. A constitutional guarantee of access to the courthouse was not intended by the founders to be an empty gesture; individuals are also entitled to a remedy by "due course of law" for injuries to "person, property, or reputation."

*Id.*

¶ 68 The *Berry* court also concluded that "'no one has a vested right in any rule of law' under either the open courts or the due process provision of the Utah Constitution." *Id.* at 675–76 (quoting *Masich v. U.S. Smelting, Ref. & Mining Co.*, 191 P.2d 612, 624 (Utah 1948)). And it further determined that "neither the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies as of the time of statehood." *Id.* at 676 (citation omitted).

¶ 69 *Berry* also stated that

> [i]t is . . . one of the important functions of the [l]egislature to change and modify the law that governs relations between individuals as society evolves and conditions require. However, once a cause of action under a particular rule of law accrues to a person by virtue of an injury to his rights, that person's interest in the cause of action and the law which is the basis for a legal action becomes vested, and a legislative repeal of the law cannot constitutionally divest the injured person of the right to litigate the cause of action to a judgment.

Lee, A.C.J., concurring in the judgment

*Id.* (citations omitted). In addition, the *Berry* court rejected the contention that the Open Courts Clause "is only a 'philosophical statement' that imposes no limitations on legislative power." *Id.* And it ultimately concluded that the legislature's enactment of a statute of repose for product liability claims implicated the Open Courts Clause.

¶ 70 All of this is consistent with the nineteenth-century case law that I have reviewed. Yet *Berry* also departed from the standards set forth in the nineteenth-century cases in one important respect. The court interpreted the Open Courts Clause as a limit on the authority of the legislature to alter the law that gives rise to legal rights and available remedies, rather than a limitation on the state's authority to restrict access to the courts to vindicate vested legal rights. To support its view the court mostly cited contemporary case law from other jurisdictions. *See id.* at 677–78 (citing contemporary cases from other jurisdictions striking down statutes of repose). And in so doing it strayed from the original meaning of our Open Courts Clause.

¶ 71 In addition the *Berry* court emphasized dicta from our decision in *Masich*. In that dicta the *Masich* court considered a hypothetical: "Assuming the legislature can abolish the common law right of action for negligence, must it return a substitute right to each and every employee in some way affected by the abrogation to meet the test of constitutionality?" 191 P.2d at 624. *Masich* said no: "If the legislature were to abolish all compensation and all common law rights for negligence of an employer, no contention could reasonably be made that it was a proper exercise of police power." *Id.*

¶ 72 But this dicta is irreconcilable with the dicta that immediately preceded it, in which the *Masich* court indicated that "no one has a vested right in any rule of law" and reasoned that "[m]any states must have held that both statutory rights and common law rights can be taken away." *Id.* If not so, reasoned the *Masich* court, any statutes "which abolish actions for seduction, breach of promise, criminal conversation, and alienation of affections, would be unconstitutional." *Id.* The court in *Masich* offers no principle to reconcile its contradictory views on the constitutionality of legislative abrogation of some common law rights but not others.

¶ 73 In contrast to the standard laid down in *Berry*, the nineteenth-century cases consistently recognized legislative power to change the substance of the law establishing liability and to alter

available remedies. Those cases uniformly rejected open courts challenges asserting the contrary.[97] So our *Berry* line of cases is

---

[97] *See Ex parte Pollard*, 40 Ala. 77, 93 (1866) ("This provision had its origin in '*Magna Charta*,' and was intended as a restriction upon royal power. It is an historical truth, that in England, the struggle has constantly been to place limitations upon the power of the crown, and not upon that of the parliament. We admit, however, that in our country, it applies to legislative and all other power. But, whilst it is the promulgation of a wholesome restriction, and is of no little value as a safeguard against error and injustice, the landmarks of legislative authority are rather to be found in the division of power contained in the constitution, among the three branches of government, and the specific limitations imposed by the instrument on the law-making branch, than in this general declaration of the bill of rights." (citations omitted)); *Parker*, 46 Ark. at 235–36 ("The general assembly is vested with the power to change, control, modify and abolish remedies in the manner and to the extent the state can do so, subject to the limitations on that power, if any, contained in the constitution of the state. It is true, every person is entitled to a certain remedy for all injuries or wrongs to his person, property or character; but to the legislature belongs the power to determine and provide the remedy. He ought to obtain justice freely and without purchase; promptly and without delay; but it is the duty of the legislature to provide the mode and proceedings in which it shall be administered. In the absence of constitutional limitations, the courts have no right to interfere with the exercise of this power. *Section* 13 of *article* 2 of the constitution is an abstract declaration of right, and is not a limitation on the power of the legislature. It is too uncertain and indefinite to form rules for judicial decisions, and serves rather as an admonition addressed to the judgment and the conscience of all persons in authority than a limitation." (citation omitted)); *Johnson v. Higgins*, 60 Ky. (3 Met.) 566, 571 (1861) ("To say that the [open courts] provision was, in any wise, designed to regulate the jurisdiction of the courts, would at once bring it into collision with art. 4, sec. 17, which, in so many words, gives that power to the legislature."); *State v. Dubuclet*, 28 La. Ann. 698, 703 (1876) ("The [open courts] article of the constitution does not prescribe this process of law that he is entitled to. Justice shall be administered without denial or unreasonable delay. The article is silent as to how justice shall be administered. Yet, in seeking the adequate remedy, due process of law must be followed; justice is to be administered by due process of law. It is for the Legislature to

(Continued)

36

Lee, A.C.J., concurring in the judgment

incompatible with the historical standard on this point. These cases, as noted, purport to limit legislative authority to eliminate causes of action—whether through statutes of repose or by changing rules governing liability or limiting available remedies. *See, e.g.*, *Berry*, 717 P.2d 670; *Judd v. Drezga*, 2004 UT 91, 103 P.3d 135. This is inconsistent with the original meaning of the Open Courts Clause.

¶ 74 In fact, I have not found a single open courts case in the pre-statehood era striking down a statute on account of a prospective legislative abrogation of a common law cause of action. A Minnesota case, *Allen v. Pioneer Press Co.*, 41 N.W. 936 (Minn. 1889), comes closest to stretching an Open Courts Clause in this manner. *Allen* suggested in dicta that "principles of natural justice" might impose an outer bound on the legislature's authority to change common law causes of action. *See id.* at 938. But the *Allen* court nonetheless upheld the legislative abrogation of several remedies in libel suits, noting the "wide latitude [that] must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong." *See id.* at 938–39.

¶ 75 Thus, *Allen* generally invoked open courts principles and referred (in dicta) to a nebulous outer limit on legislative authority. But the *Allen* court never connected that limit to the text of the Open

---

prescribe the due process of law . . . ."); *Stratton v. European & N. Am. Ry. Co.*, 74 Me. 422, 428 (1883) ("But, says the counsel, it is a 'legal maxim that for every right there is a remedy,' and therefore one of these actions must be maintainable. The maxim we admit in its full force, but the conclusion does not follow. In the legal sense there is no difficulty about the remedy, which is a 'judicial means of enforcing a right or redressing a wrong.' The trouble here is in establishing the right. The right to redress for such an injury as is here complained of, is given by the statute and by that alone. . . . What the statute gives it may take away."); *Preston*, 33 Me. at 560–61 ("The State, by its legislative enactments, operating prospectively, may determine that articles injurious to the public health or morals, shall not constitute property, within its jurisdiction. . . . If a legislature should declare that no person should acquire any property in them, for such a purpose, there would be no occasion for complaint that it had violated [the Open Courts Clause or any other] provision of the constitution."); *Templeton*, 29 P. at 797 (Or. 1892) (distinguishing vested rights from mere expectancies and concluding that legislature has authority to change the law giving rise to rights, so no one can have a vested right in the general state of the law).

Courts Clause per se; it attributed that limit to "principles of natural justice."[98] And it nevertheless recognized broad legislative discretion to define legal rights and available remedies. *Id.* at 938.

¶ 76 The "natural justice" limit in *Allen* is not only dicta; it is an outlier in the cases from the relevant time period. The overwhelming majority of cases roundly rejected the theory that the Open Courts Clause limited the legislature's authority to change the law giving rise to legal rights and the available remedies. *See supra* ¶ 73 n.97. And again, no open courts case from the nineteenth century struck down legislation for abrogating a common law cause of action.

¶ 77 The open courts cases in place at the time of our constitution's framing recognized a limit on the legislative

---

[98] *Allen*, 41 N.W. at 938 ("The guaranty of a certain remedy in the laws for all injuries to person, property, or character, and other analogous provisions, such as those against exacting excessive bail, imposing excessive fines, inflicting cruel and inhuman punishments, and the like, inserted in our bill of rights, the equivalents of which are found in almost every constitution in the United States, are but declaratory of general fundamental principles, founded in natural right and justice, and which would be equally the law of the land if not incorporated in the constitution. There is unquestionably a limit in these matters, beyond which, if the legislature should go, the courts could and would declare their action invalid. But inside of that limit there is, and necessarily must be, a wide range left to the judgment and discretion of the legislature, and within which the courts cannot set up their judgment against that of the legislative branch of the government. These constitutional declarations of general principles are not, and from the nature of the case cannot be, so certain and definite as to form rules for judicial decisions in all cases, but up to a certain point must be treated as guides to legislative judgment, rather than as absolute limitations of their power. And in determining whether in a given case a statute violates any of these fundamental principles incorporated in the bill of rights, it ought to be tested by the principles of natural justice, rather than by comparison with the rules of law, statute or common, previously in force. Again, it must be remembered that what constitutes 'an adequate remedy' or 'a certain remedy' is not determined by any inflexible rule found in the constitution, but is subject to variation and modification, as the state of society changes. Hence a wide latitude must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong.").

abrogation of "vested rights"—rights in claims that had accrued prior to the enactment of the legislation in question.[99] But there was a general consensus in the cases that no one had a general vested right *in the law*; only vested *causes of action* were protected. With this in mind, courts routinely held that the legislature had plenary authority to prospectively amend or abrogate existing causes of action or available remedies.[100]

¶ 78 The vested rights cases might be the root of the modern notion of a general open courts limit on legislative power to abrogate causes of action.[101] In the vested rights context, after all, courts

---

[99] *See, e.g., Commercial Bank of Natchez*, 16 Miss. at 56–58, 61 (holding that legislative enactments that undermine vested rights are contrary to the Open Courts Clause); *Lafferty*, 38 Ohio St. at 48–49 (noting that shortening a limitation period as to existing rights might violate the Open Courts Clause*); Templeton*, 29 P. 795 at 795–97 (reasoning that while vested rights cannot be deprived, no one has a vested right in the general state of the law); *Menges*, 33 Pa. at 497–99 ("The law which gives character to a case, and by which it is to be decided (excluding the forms of coming to a decision), is the law that is inherent in the case, and constitutes part of it when it arises as a complete transaction between the parties. If this law be changed or annulled, the case is changed, and justice denied, and the due course of law violated."); *Byers*, 5 Pa. D. at 683–86 (holding that as to a cause of action that has already accrued the legislature cannot enact a law eliminating the claim retroactively); *Von Baumbach*, 9 Wis. at 576–80 (citing U.S. Supreme Court cases holding that existing remedies laws are a legal backdrop relied on by parties entering contracts, such that changing the remedies might impair vested rights where there are reliance interests).

[100] *See, e.g., Stratton*, 74 Me. at 428 ("But, says the counsel, it is a 'legal maxim that for every right there is a remedy,' and therefore one of these actions must be maintainable. The maxim we admit in its full force, but the conclusion does not follow. In the legal sense there is no difficulty about the remedy, which is a 'judicial means of enforcing a right or redressing a wrong.' The trouble here is in establishing the right. The right to redress for such an injury as is here complained of, is given by the statute and by that alone. . . . What the statute gives it may take away.").

[101] For example, in *Horton v. Oregon Health and Science University*, the Oregon Supreme Court characterized the nineteenth century consensus as supporting limits on legislative authority, but cited

(Continued)

Lee, A.C.J., concurring in the judgment

sometimes considered whether the law preserved an adequate substitute remedy.[102] But on closer scrutiny, these cases do not establish a general open courts limitation on the legislative power, and so there is no general requirement that the legislature preserve a substitute remedy in all cases. Instead, nineteenth-century open courts cases simply recognize constitutional limits on the *retroactive* application of legislation in a manner abrogating or limiting *vested claims or remedies.*

¶ 79 For these reasons I would overrule the holdings in the *Berry* line of cases that the Open Courts Clause restricts the legislative power to reform the common law under a test that balances our sense of social policy. The nineteenth-century understanding of the open courts guarantee does not encompass a restriction on legislative reassessment of common law causes of action. Courts in the relevant time frame repeatedly acknowledged the legislature's plenary authority to prospectively alter laws giving rise to legal rights.[103] That principle, moreover, leads to the conclusion that the legislature likewise has the power to impose statutes of limitation and repose on a prospective basis. And if the legislature has the greater power to abrogate a cause of action altogether, it must also have the lesser power to place time limitations on asserting claims.

---

only vested rights cases for this proposition. 376 P.3d 998, 1021–1025 (Or. 2016). In fact, the first case cited by the Oregon court expressly rejected the proposition for which *Horton* cited it. The Oregon court reasoned that *Stowell v. Flagg*, 11 Mass. 364 (1814), supports the view that the legislature must substitute one remedy for another. *Horton*, 376 P.3d at 1021–22. But that court misinterpreted *Stowell*, which expressly identified plenary legislative authority to alter the law that gives rise to rights. *Stowell* stated that "[a]s the common law action is founded on a wrong done by the defendant, and the process itself presupposes a tort, when the legislature has authorized the act itself complained of, we cannot conceive that the action remains." 11 Mass. at 365. In other words, if a statute expressly authorizes a course of conduct that the common law once deemed tortious, the common law is overruled, no injury is done by the conduct, and no remedy need be afforded.

[102] *See Parker*, 46 Ark. at 235–36 (1885) (asserting plenary legislative authority to establish and alter remedies); *Byers*, 5 Pa. D. at 683–86 (suggesting that the legislature may change remedies retroactively only if some substitute remedy remains).

[103] *See* cases cited *supra* note 101.

Lee, A.C.J., concurring in the judgment

¶ 80 As noted above, there are a few cases from the era of the Utah founding that express open courts concerns regarding statutes of limitation or repose.[104] On examination, however, these courts were protecting against legislative interference with access to courts to vindicate *vested* rights.

¶ 81 And "vested rights" is itself a term of art with a specific, historical meaning. Thomas Cooley's treatise on constitutional limitations illuminates the meaning of vested rights during the period. In the treatise, Cooley states that

> a right cannot be considered a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws: it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another.

THOMAS M. COOLEY, CONSTITUTIONAL LIMITATIONS 511 (2d ed. 1871). Under this definition, there is no legislative interference with vested rights where the legislature alters the "general laws" changing the legal landscape under which rights might vest in the future. *See id.* ("Acts of the legislature . . . cannot be regarded as opposed to fundamental axioms of legislation, 'unless they impair rights which are vested; because most civil rights are derived from public laws; and if, before the rights become vested in particular individuals, the convenience of the State procures amendments or repeals of those laws, those individuals have no cause of complaint. The power that authorizes or proposes to give may always revoke before an interest is perfected in the donee.'"(quoting *Merrill v. Sherburne*, 1 N.H. 199, 213–14 (1818))).

¶ 82 Thus, vested rights would not be disrupted by the enactment of a prospectively applicable statute of repose. The repose period would become part of the general law governing the accrual of a right of action; where a claim fails to accrue in the repose period, no right would vest and, therefore, no right could be improperly disturbed by the statute. This notion of vested rights is consistent with the pre-statehood cases articulating plenary legislative authority to alter the law that gives rise to rights.[105]

---

[104] *See* cases cited *supra* note 92.

[105] *See* cases cited *supra* note 101.

Lee, A.C.J., concurring in the judgment

¶ 83 This approach is also consistent with the nineteenth-century cases applying open courts provisions to statutes of repose or limitation. In each case, the plaintiffs had a vested property right that subsequent legislation purported to extinguish through the enactment of a statute of repose. In *Byers v. Pennsylvania Railroad Company*, for example, the court was primarily concerned with the *retroactive* application of a statute of limitations *to pending cases*—cutting off rights of action that had previously accrued and were then pending in the courts. 5 Pa. D. at 683–86. In the remaining cases, courts were concerned with laws precluding recourse to the courts to redress an injury to vested rights in personal or real property. *Preston*, 33 Me. at 558, 560–63 (right to bring action for replevin of personal property unlawfully confiscated by the government); *Thornton*, 11 Minn. at 339–40 (right to bring action for trespass caused by flooding); *Baker*, 11 Minn. at 489–90 (right to bring ejectment action). While the facts of these cases vary, in each case, the court determined that the plaintiff's real (or personal) property rights had vested[106] and the legislature's enactment of a statute of repose operated to cut off any opportunity to access the courts to pursue a remedy for the violation of a vested right.[107]

---

[106] *Preston*, 33 Me. at 558, 560–63 ("The prohibition to sell them cannot prevent any person from acquiring and possessing them for his own use without any intention to sell them. Nor can it prevent their transport from one town or city to another, or through the State, when there is no intention to make sale of them. There is nothing found in the Act indicative of an intention to prevent their being property, when thus possessed or used."); *Thornton*, 11 Minn. at 337, 339–40 ("The complaint shows facts constituting a trespass to the plaintiff's real estate, whereby he is damaged. A cause of action has accrued to the plaintiff for the recovery of such damages."); *Baker*, 11 Minn. at 498–99 ("That the plaintiff was the owner of the land and authorized to prosecute and defend in the courts, his rights thereto, is admitted.").

[107] *See Preston*, 33 Me. at 558, 560–63 (ruling on constitutional avoidance grounds that the statute should be interpreted narrowly to allow replevin actions to recover unlawfully confiscated alcohol); *Thornton*, 11 Minn. at 339–40 ("If a structure, intended as a milldam, is erected, but not used so as to flow back water to the detriment of any person until more than two years after the date of its erection, then, according to the defendant's construction of this act, no right of action would exist in favor of those injured. If this is the meaning of

(Continued)

Lee, A.C.J., concurring in the judgment

¶ 84 Accordingly, the original meaning of the Open Courts Clause would not limit legislative authority to prospectively enact statutes of repose. And because the *Berry* standard has engendered no reliance interests due to the incoherence of its content, *supra* ¶ 58, I would repudiate our contrary holding in *Berry*. *See* 717 P.2d at 678-79 (rejecting view that legislature may prospectively preclude a cause of action from vesting by establishing a statute of repose).

¶ 85 I would also recognize a substantive Open Courts Clause limitation on legislation retroactively limiting the time for raising a vested claim. That limitation would be framed by the above-cited

---

the law, it would seem to be in contravention of that clause of the Constitution which provides that 'every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in person, property or character.' But this, we think, is not its meaning. The section above quoted only attempts to *limit* the time within which actions may be commenced for 'damages occasioned by the erection of a milldam.'"); *Baker*, 11 Minn. at 489–99 ("That he has been deprived of either his property, or legal rights, by that due process of law which 'proceeds upon inquiry, and renders judgment after trial,' cannot be pretended. If the statute should be sustained, it would effect this; for a person is deprived of his property and legal rights when he is forbidden to test or question the validity of the title of an adverse claimant. The statute would deprive a person of his property if he fails to do an act which may be done or omitted without any violation of law, and which neither his duty or interest requires him to do, and makes the performance of such act a condition to his rights to sue for or defend his property in the courts; whereas the constitution declares that he shall not be deprived of his property by any mere legislative act, and that he shall be entitled to 'justice freely and without purchase, completely and without denial, promptly and without delay, conformably to the laws.' There can be no difference in principle between requiring a party to bring a suit, pay a sum of money, or do any other act as a condition to a status in court, or the enjoyment of his property. That justice is not '*free*' and '*without purchase*,' within either the spirit or letter of the constitution, which can only be obtained on either condition. We do not mean to question the power of the Legislature to require a party to pay the necessary costs of litigation, or to prescribe rules for the guidance of courts and litigants, but it seems very clear that beyond this they cannot attach any conditions or limits to the rights that are guaranteed absolutely, unconditionally, freely, and certainly, by the constitution." (emphasis in original)).

cases, which ask whether the statute preserves a reasonable period for plaintiffs to bring claims that vested prior to the enactment of the statute of limitation or repose. *See, e.g.*, *Baker*, 11 Minn. at 494 ("We have seen that the Legislature have not the right or power to deny a person a reasonable time within which to commence an action . . . .").

## IV. PETITIONERS' CLAIMS

¶ 86 The claims at issue here are premised entirely on the *Berry-Judd* theory that I would repudiate. Because the legislature once afforded a right to recover total disability benefits, petitioners contend that it could not abrogate that right through a statute of repose. I would reject that claim because it relies on a premise that has no basis in the Open Courts Clause. Petitioners do not assert that their claims had vested prior to the enactment of the repose statute. Nor could they—the provisions at issue were enacted long before they suffered their respective injuries.

¶ 87 I would accordingly affirm. I would hold that Petitioners failed to state a claim under our Open Courts Clause because the clause does not limit legislative authority to prospectively alter the law giving rise to legal rights.

———————

JUSTICE PEARCE, concurring:

¶ 88 Because our case law currently recognizes that the Open Courts Clause "embrace[s] a substantive conception of the open courts protection," the result the majority reaches is correct. *In re Adoption of B.Y.*, 2015 UT 67, ¶ 57, 356 P.3d 1215. And the analysis the majority employs remains the correct analytical model unless and until a party meets its burden of establishing that our prior case law is unworthy of stare decisis respect.

¶ 89 I write separately to echo the view that Justice Lee articulates in his separate concurrence—that our Open Courts Clause jurisprudence is not entitled to much stare decisis weight. I also write to express my admiration for Justice Lee's research into the historical understanding of the meaning of the Open Courts Clause. Justice Lee has provided a model for the type of research and analysis that I would hope this court sees from parties in future cases.

¶ 90 By writing separately, I do not wish to appear critical of this court and its decades-long effort to definitively interpret the Open Courts Clause. To the contrary, the question is difficult and the stakes are high because it explores the often blurry lines that

separate the powers that the people of Utah have divided between the branches of their government.

¶ 91 But if we start from the premise that our powers are limited to those the Utah Constitution gives us, our need for an extra measure of care comes into sharp focus. If the people of Utah intended that the Open Courts Clause provide a guarantee against the elimination of remedies, and we find that they did not, we will read out of the Constitution an important protection that the people of Utah intended. If, on the other hand, we conclude we have the ability to strike down legislation for reasons the Utah Constitution never contemplated, we may find ourselves impermissibly treading upon territory that the people of Utah gave to the Legislature.

¶ 92 That consideration alone would cause me to hesitate before I ever considered the meaning of the Open Courts Clause to be definitively answered. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (the policy rationale underlying stare decisis "is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions"); *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 94 (1936) (Stone and Cardozo, JJ., concurring) ("The doctrine of stare decisis . . . has only a limited application in the field of constitutional law."); *see also* Jack L. Landau, *Some Thoughts About Constitutional Interpretation,* 115 PENN ST. L. REV. 837, 838 (2011) ("[I]n the case of state constitutional interpretation, the pull of stare decisis may not be as strong as it is in other contexts.").

¶ 93 Our test for assessing precedential weight confirms that our Open Courts Clause jurisprudence is particularly susceptible to reexamination. In *Eldridge v. Johndrow,* we opined that

> [o]ur decisions have identified two broad factors that distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down. The second factor encompasses a variety of considerations, including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned.

2015 UT 21, ¶ 22, 345 P.3d 553.

¶ 94 As to the first factor, the history of our interpretation of the Open Courts Clause undercuts the persuasiveness of the authority. In one of our earliest opportunities to address the Open Courts Clause, we held that article I, section 11 required that the "courts must always be open to all alike" and that the Legislature could not "curtail[]" that access. *Union Sav. & Inv. Co. v. Dist. Court*, 140 P. 221, 225 (Utah 1914). One year later, in *Brown v. Wightman*, we opined that the clause places "a limitation upon the Legislature to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy." 151 P. 366, 366–67 (Utah 1915). We also noted that the "right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts." *Id.* at 367. Soon after that, we reiterated that the Open Courts Clause did not permit this court to "reach out and usurp powers which belong to another independent and co-ordinate branch of the state government." *Salt Lake City v. Utah Light & Traction Co.*, 173 P. 556, 563 (Utah 1918).[108] Thirty years later, in *Masich v. United States Smelting, Refining and Mining Co.*, we held that the Open Courts Clause allowed the Legislature to eliminate a common law right to a remedy for an employer's negligence that caused a partial disability from silicosis. 191 P.2d 612, 624–25 (Utah 1948) ("[B]oth statutory rights and common law rights can be taken away, otherwise, there can be no question that acts which abolish actions for seduction, breach of promise, criminal conversation, and alienation of affections, would be unconstitutional.").

¶ 95 In 1985, we dramatically changed our view of the Open Courts Clause. *See Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). The *Berry* court acted as if it wrote on a blank slate and did not even attempt to wrestle with our prior Open Courts Clause case law. And since that time, various members of this court have, with varying degrees of vehemence, assailed *Berry*'s test and its underlying reasoning. *See Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 108, 974 P.2d 1194 (Zimmerman, J., concurring) ("I would overrule *Berry*."); *Laney v. Fairview City*, 2002 UT 79, ¶ 85, 57 P.3d 1007 (Wilkins, J., concurring in part and dissenting in part) ("I would overturn *Berry* in favor of the more procedural interpretation of the Open Courts Clause . . . ."); *Wood v.*

---

[108] Chief Justice Joseph E. Frick, whose service on the court began in 1906—just ten years after statehood—authored *Union Savings*, *Brown*, and *Utah Light & Traction*.

*Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 9 n.1, 67 P.3d 436 (two members of this court agreed "that the decision in *Laney* to adhere to the *Berry* interpretation and test was erroneous" but applied the *Berry* test out of respect for stare decisis). The continued willingness of certain members of this court to dedicate pages of ink to arguing with *Berry* has undoubtedly undercut *Berry*'s ability to persuade. *See, e.g., Laney,* 2002 UT 79, ¶ 93 (Wilkins, J., concurring in part and dissenting in part) ("Clearly, the members of this court, past and present, do not agree that *Berry* is the best method for analyzing Open Courts challenges."). In 2002, two members of this court concluded that

> the *Berry* interpretation of the Open Courts Clause is erroneous; the accompanying *Berry* test has proven to create more problems than it has solved. . . . *Berry* has proven to be unworkable over a period of 17 years, has not been adhered to unanimously, has been questioned and chastised by members of this court . . . has been criticized by legal scholars, and presents separation of powers problems.

*Id.* ¶ 94 (Wilkins, J., concurring in part and dissenting in part).

¶ 96 Perhaps because of this court's continued public discussion of *Berry*, we have been asked on several occasions to revisit the holding. *See, e.g., Judd v. Drezga,* 2004 UT 91, ¶ 11, 103 P.3d 135; *Laney,* 2002 UT 79, ¶ 29; *Ross v. Schackel,* 920 P.2d 1159, 1162 (Utah 1996).[109] Certain precedents, such as *Marbury v. Madison,* 5 U.S. 137 (1803), have "consistently draw[n] the Court's esteem as a pillar of our constitutional order." Randy J. Kozel, *Precedent and Reliance,* 62 EMORY L.J. 1459, 1476 (2013). But some "are plainly more likely than others to be reconsidered and overruled." *Id.* Our Open Courts Clause precedent falls into this latter category. The repeated dissents have signaled unease and the willingness of members of this court to reconsider our jurisprudence.

---

[109] Our modifications to *Berry* also undercut the persuasiveness of *Berry*'s original reasoning. Most significantly, in *Judd*, this court abandoned heightened scrutiny for article I, section 11 challenges. 2004 UT 91, ¶¶ 30–31. And today the majority further clarifies *Judd*'s reframing of the *Berry* test. *See supra* ¶¶ 22–24. As the amicus Board of Regents notes in its brief, "testing reliance is a challenge" because "it is difficult to know what the current test is."

¶ 97 The judicial back and forth also speaks to *Eldridge*'s second factor: how firmly the precedent has become established. As noted above, several separate opinions have condemned *Berry. See supra* ¶ 96. The bar has been on notice that this court has continued to debate the meaning of the Open Courts Clause such that it would not create an injustice or hardship if it were overturned; at least no one has yet to articulate the injustice and hardship that would result if this court overturned *Berry.* All of this inclines me to conclude that the precedential weight of *Berry* and its offspring is low and that the constitutional meaning of the Open Courts Clause is ripe for re-examination in the appropriate case.

¶ 98 By commenting upon the state of our jurisprudence, I do not wish to suggest that a party seeking to overturn *Berry* will not have some lifting to do. To replace *Berry,* a party will need to do more than just convince this court that *Berry* does not accurately reflect the framers' original intent. Rather, that party will need to convince us that there is a better, more correct interpretation of the Open Courts Clause.[110] As we have noted with respect to other constitutional language, this requires review of the plain language informed by "historical evidence of the framers' intent." *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 10, 140 P.3d 1235. Counsel should also look to lessons from our common law, Utah's "particular . . . traditions," and "court decisions made contemporaneously to the framing of Utah's constitution in sister states" with similar provisions in an effort to discern the meaning of the constitution. *Id.* ¶ 11 (alteration in original) (citation omitted).

¶ 99   After this case was fully briefed, we asked[111] the parties and the Attorney General's Office—and permitted amicus—to brief four questions, including article I, section 11's original meaning. In response, we received well-argued and well-written briefs that discussed the constitution's plain language, the interpretation of other states' open courts provisions, and the historical backdrop

---

[110] As Samuel Rayburn, former Speaker of the United States House of Representatives, once said, "Any jackass can kick down a barn, but it takes a good carpenter to build one." *See, e.g.*, CRAIG VOLDEN & ALAN E. WISEMAN, LEGISLATIVE EFFECTIVENESS IN THE UNITED STATES CONGRESS: THE LAWMAKERS 4 (2014).

[111] Ask is a euphemistic way to describe a supplemental briefing order.

against which the voters of Utah approved a constitution that contained an open courts clause.

¶ 100 The briefs we received are the types of briefs we need when presented with a question concerning the original meaning of constitutional language. The briefs analyze the plain meaning of the constitutional text, our prior case law, the interpretation other courts have given to similarly worded provisions in their state constitutions, and what lessons might be gleaned from the historical context. We need briefs of this quality, because without the parties' help, we risk engaging in what Justice Blackmun might describe as a "self-guided tour" of the historical record. *See Griffin v. United States*, 502 U.S. 46, 60 (1991) (Blackmun, J., concurring). However, it appears that before we can put the debate surrounding the Open Courts Clause to rest, we will need to more closely examine the historical record.

¶ 101 Indeed, reviewing our Open Courts Clause case law, it appears that often we based our conclusions on—or at least buttressed our conclusions with—generalizations about Utah history.[112] Our case law follows a pattern of asserting one, likely true, fact about Utah history and letting the historical analysis flow from that single fact. For example, in *Laney*, this court bolstered its reasoning that the Open Courts Clause provided a substantive guarantee by noting that the "open courts provision was adopted, as part of the original Constitution itself, at the end of the nineteenth century, during a period when abuse had generated concern and distrust of the legislative branch in numerous states." 2002 UT 79, ¶ 33. Similarly, some members of this court have drawn meaning from the observation that Utah's early settlers were "hostile to the common law, lawyers, and courts" at the time the Open Courts Clause was drafted. *Craftsman*, 1999 UT 18, ¶ 132 (Zimmerman, J., concurring). While I don't presently have reason to doubt the general accuracy of either historical assertion, I worry that undue reliance on arguments based primarily upon the zeitgeist risks

---

[112] We are apparently not alone. One commentator has opined that interpretations of open courts clauses across the country have lacked the "good historical research" that serves as "a necessary predicate to principled judicial interpretation." Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 OR. L. REV. 1279, 1281 (1995).

converting the historical record into a type of Rorschach test where we only see what we are already inclined to see.[113]

¶ 102 Justice Lee's concurring opinion marks a significant departure from the facile historical analysis our case law has tended to employ. The concurrence tackles the enormous task of reviewing the jurisprudence existing at the time the framers of the Utah Constitution saw fit to include the Open Courts Clause in the draft constitution they put before the people of Utah and anchors its analysis there. As a result, the concurrence stands on much firmer footing than our previous attempts to ascertain the meaning of the Open Courts Clause. Having modeled the type of research and analysis we will need if we are to opine upon the original understanding of constitutional provisions, I am hopeful that parties will begin to follow suit in their briefing and in the future we can rule on arguments that have been thoroughly tested by the adversarial process.

¶ 103 I concur in the majority's decision and applaud its recognition that its opinion does not "signal an end to [the] debate" concerning the meaning of the Open Courts Clause. *Supra* ¶ 34. I also applaud Justice Lee's departure from the overly simplified historical arguments that became the foundation of our prior case law. Because of the importance of the constitutional question and the possibility that lessons remain for us to learn from the historical record, stare decisis principles should not prevent us from revisiting the Open Courts Clause's meaning in the appropriate case.

---

[113] What appears to be missing from our jurisprudence is reference to direct historical evidence or primary source material. There are a couple of possible explanations. First, it is possible that it doesn't exist—that, to the extent the framers of the Utah Constitution had any thoughts about how the Open Courts Clause should be interpreted, they have been lost to the fogs of time. Second, it is possible that we haven't looked, or looked with enough diligence, in the right places. We are attorneys and judges, not historians. I would encourage those using the historical record to endeavor to go beyond what we have previously referenced, because, as one commentator has noted, "[t]he cure for poor historical analysis is to try to do it better, not to ignore history altogether." Hoffman, *By the Course of Law, supra* note 112 at 1283.